So, Madam Clerk, will you please call the first case? 10-91-085 Construction Company v. Village of Western Springs Good morning. Good morning. How are you? Jeff Oprin here on behalf of the appellants. And I estimate it will probably take about 20 minutes, but I'm always a bad estimator. A lot obviously depends on the number of questions you guys have. Okay, and we'll give you some time before we bottle off. I'd appreciate that. Thank you. Good morning. Good morning. Judith Coleman on behalf of Hartz Construction Company. We're the plaintiffs' appellees. I will not be arguing. I will be deferring to the attorney for Western Springs today. Okay. Thank you very much. Counsel? Good morning, Your Honors. Jacob Karadja, K-A-R-A-C-A, here for the Village of Western Springs. And my associate, Mellor Maluzzi. Only I'll be arguing today. Good morning to both of you. I assume it will also take about 15 to 20 minutes in that range. I'll probably be closer to 15. Fine. Thank you, sir. Thank you. Could I just have one request? If you keep your voices up, it helps me. Thank you. May it please the Court? Counsel? My name is Jeff Alperin, as I mentioned. I represent the Rhodes defendants in this case. I'll refer to them colloquially as the Rhodes defendants. They're the appellants. And, you know, unless you're married, I guess, it's unusual that we have the opportunity to talk about the duty to cooperate at such a great extent. But that's going to be at least one of my main focuses here this morning. So if I may, let me direct your attention to the recapture agreement that I know this district has seen before, and you see it again in this appeal. And let me focus your attention there and talk about the purpose for a minute of that recapture agreement. I think in your prior opinion in this case and in the agreement itself, it's clear that the overriding purpose of that agreement is to reimburse the Rhodes defendants for something they'd already done by building the improvements, you know, to the area that would enable somebody else to come in, and use those improvements, sidewalks, streets, sewage, that sort of thing. The corollary to that main purpose is that, and it's included in the agreement, as we'll take a closer look at here in a minute, is that Rhodes' job was to defend the agreement. You know, it's contained clearly, I think, there in paragraph 9, which we'll look at in more detail. And implicit in that is that the village is going to cooperate with Rhodes with respect to defending that agreement. There's no specific provision in that agreement that says the village is going to cooperate. Is that correct? You're correct. There is no specific explicit provision that says village, you must cooperate. Now, the law implies that provision as being there, unless it's explicitly taken out. And I've seen agreements where they say, you know, there is no duty to cooperate. That's not present here. Here the contract is silent on the duty to cooperate, which means inherently it's there. You can look at, starting from the waste management case from the Illinois Supreme Court, and all the cases that we cited, getting ahead of myself here, but I think we listed them. I've got a page number even. Well, regardless, we'll come to it. You know, over and over and over and over again, we see that the implicit duty to cooperate is there in Illinois law as part of the duty of good faith and fair deal. Now, page one of the reply brief is where I delineate several of those cases, including cases that are not in the insurance field, which seems to have grabbed the trial court's attention. The Williston Treatise, which I also list on page 18 of my opening brief, that also delineates and sets forth that the duty to cooperate is implicit in all contracts. So what about good faith? Good faith requires a party, as you know, I'm sure, vested with contractual discretion to exercise it reasonably. It may not be exercised arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. That's key here because, and that also is set forth in the Rossetti case that we set forth in our brief. Here, an important point, I think, that I'm not sure came forward out of the briefs, is that the village has never asserted that they cooperated with Dury Roads, not once. All they say is it doesn't apply. The trial court bought into that. The trial court never made any factual findings that the village cooperated with the Roads defendants at any time. She also said, yeah, you're right, it doesn't apply. That's an error of law right there. So let's turn to the facts. Let's turn to the agreement itself. And it's on there on page 9 of the opening brief. And specifically I'm looking at paragraph 9. And there's two paragraphs of paragraph 9, I guess portions I'll refer to them. The first portion says the developer, now in this case that's Roads, further agrees to identify and hold harmless and defend the village of Western Springs. And then it goes on for quite a bit. I won't read it all. That's where the duty to defend and duty to identify kicks in. The second paragraph, which was inserted during the negotiations with respect to the language of the recapture agreement, says in the event of any such lawsuit, I'll shorten it a little bit, the village shall have the right to determine the attorney of its, his or hers choice, to represent and defend their interests in any legal or administrative action all at developer's expense. Interests. Again, that's an important phrase here, and it comes up over and over in the briefs, and it will come up over and over again during my oral argument before you guys. In order to use that provision, we need to know what the village's interests here are. Not once, anywhere, down below, when Gary wanted to meet with the village, at the trial court, up here on the appellate court and all the briefs, not once has the village delineated what its interests in this litigation are, or if they are in any way different from what the roads' interests in defending the agreement might have been. Not once. All right. In my brief, and if you'll permit me, I'll go through the facts that relate a little bit to how these common law duties apply in this situation. We've got period one. I've broken it down into three separate periods. Period one is after this recapture agreement had been uttered, and that was back in October of 2002. It might have been December of 2002, depending upon whether the ordinance was passed or signed and all that. Regardless, it was the end of 2002. After the recapture agreement and prior to this lawsuit filed by Hartz. Now, at that point, we had a recapture agreement that had been negotiated by and between roads and the village. Hartz played a role in that recapture agreement, as I set forth ad nauseum a little bit in my brief, because Hartz was involved in negotiating with roads, with the village's attendance and with the village's cooperation with respect to what are we going to do about recapture amounts. Hartz, way back when, well before this recapture agreement was ever agreed to and entered upon, entered with, passed, Hartz had agreed to the per-unit methodology. Now, that negotiation didn't lead to a full, complete agreement, but the negotiations between roads and the village continued. And it was roads' understanding, as we set forth in the brief and during his deposition, that the village was communicating with Hartz during this period. At a certain point, they come to a negotiated amount of how much are we going to charge on this per-unit methodology, what's the dollar amount. I forget the exact numbers, but roads had wanted in excess of $30,000, I believe it was, and Hartz had wanted that number down in the $16,000 range. They came up, the village guy, the village engineer says, we're going to make a $24,000 and some change per unit. Okay, fast forward a little bit. Now the agreement's been entered into, right? New developer, Hartz, now comes to the village and says, hey, I want to develop my property, which is adjoining the property here at issue in the recapture. And he says, I would like to develop my property, but I'm going to challenge this per-unit methodology. I don't think it should apply. At that point, and this is in September of 2004, the village engineer, Mr. Ziegler, calls up Mr. Rhodes and says, look, if you don't want to give me the actual cost data, the actual cost data, not an estimated, because that's what the village attorney, but that's what village Mr. Ziegler had come up with before. This was all based on estimated data. If you don't want to give me the actual cost data, the village might have to revisit the agreement. Well, the agreement's already been passed. It's been passed for two years now. In October of 2004, the village, Mr. Ziegler, passes along the DeWalt Hamilton report that the Hartz folks had prepared that challenged the recapture agreement and the formula on several bases. A year later is when Hartz receives village approval, and that was in October of 2005. In December of 2005, the village attorney tells Rhodes that Hartz has problems with the recapture agreement. The village has no stake in the outcome. Take care of it, he says. Also in December of 2005, Mr. Ziegler, who came up with the number, the $24,000 per unit number to begin with, sends a letter saying, unless you provide me with more backup data, it would significantly limit the village's ability to assist in the recapture. Well, the agreement's already been executed, passed by ordinance. It's already out there. The village's duty at this point was to enforce that agreement, not to challenge it. What they're doing, and the testimony backs this up as we set forth in the brief, they're meeting with a new developer, Hartz at this point, and saying, hey, I know you want to develop your property. Hartz says, man, that number's an awful high amount. Well, let's see if we can help you out a little bit. Instead of enforcing the terms of their own ordinance that sign this agreement, they're encouraging Hartz to challenge it. So Rose provides the backup data. He also objects to the village's position, saying, hey, look, stop this. If you want to continue these negotiations with Hartz, I should be there. The village ignores it. The village, and this is in the testimony, which we set forth in the brief, the village continues to negotiate with Hartz through January of 2006. Period two. January of 2006 is when this Hartz lawsuit is filed. And this is before Hartz filed for motion, or summary judgment, and the village also countered with a summary judgment motion. During that period, right after the lawsuit, the record shows that Gurry Rhodes sent a letter saying, hey, I want to meet with you, village. We have to meet to determine what the interests of the village are. Now, remember, interests of the village are important with respect to Gurry Rhodes' duty to defend and identify. It says right there in paragraph nine, and defend their interests. So Gurry's trying to figure out, you know, are you entitled to a separate attorney to come in and defend your interests? I'd like to find out what those interests are. I'd like to find out if those interests conflict with my interests in this lawsuit. Recall, again, too, and I know this is a common boilerplate language that, you know, sometimes we see in briefs that we don't jump on, but they are important. And that is contracts of indemnity and parties receiving the duty to defend, if you will, those contracts are strictly construed against the party who's receiving it. We're not an insurer here. Now, shortly thereafter, the village flatly refuses to meet with Rhodes, refuses to meet with him in January, refuses to meet with him during the summer. I think there's some evidence in the record of July and August requests also being made. Just flatly refuses to even meet with him to begin with. Instead, the village files a lawsuit against Rhodes, a counterclaim against him. It became not just cooperating with him, it became actively and openly hostile to Mr. Rhodes. Parts joins in at least one of those counts. And, indeed, you'll see they joined in this appeal on behalf of the village. Counsel, is it accurate to state that Rhodes had a disagreement with the village about how to interpret this recapture agreement? I don't know because we've never heard from the village. Well, let me ask you this question. There's no question that the recapture agreement gives the village the right to, quote, determine the attorneys of their choice to defend their interests. They do have that right, right? To defend their interests. Right. But they have the right to select the attorney to defend their interests. Yes. Now, Rhodes didn't have the right to select the attorney for them. The village had the right. To defend their interests. To defend their interests. But there's an important point of law that's a corollary to that. The obligation and the right to select your attorney does not translate to the right to control the defense. Now, is that in the agreement? No. That's law. That's law that's set forth ad nauseum in the brief, and that's the law. I mean, if you look at the insurance law, that's the situation. You could start with waste management. Waste management. Here's the quote. I'll even quote it because I quote it in my brief. Supreme Court specifically found that where a party owes the duty to defend, the duty, quote, includes the right to assume control of the litigation, end quote. Does that duty also apply when there's a conflict because the village and Rhodes have a conflict? Does that same duty apply? Well, I would argue. Is there an exception to the rule? Yes. As we set forth in the brief, and this is on page 30 of the brief, the opening brief, there is an exception that applies when there's a conflict of interest. Now, initially, when this lawsuit was initially filed by Hart, it would seem as though the village and Rhodes would not have a duty or, excuse me, would not have a conflict of interest at that point in time. At that point in time, it would seem as though there's no conflict because they're both interested in defending this recapture agreement, making sure it's defended and approved. But once the village files a counterclaim, files lawsuits and becomes openly hostile to Rhodes, at that point a conflict definitely exists. Now, that conflict didn't exist initially. It was created by the village. I would like to say we know what the village's interests are here, but we don't because they've never told us. Who's in the best position to determine the village's interests, Rhodes or the village? The village. However, I mean, Rhodes is the guy who's footing the bill here. And the contract, if you look at the second part. But you agreed to foot the bill. What's that? You agreed to foot the bill. You agreed to indemnify and hold the village harmless, right? That's true. Okay. So you agreed to foot the bill. With the attendant law and legal implications that apply from that, yes. And that would include the duty to cooperate and the duty of good faith and fair dealing. I mean, how can you say that it was not, it would have been Gurry Rhodes's reasonable expectation that the village, once the lawsuit eventually came down the pike, of which it had no interest in. I mean, it admits freely, you know, look, this is, we're just a pass-through here. It would not be Gurry's reasonable expectation that the village would refuse to meet with him and refuse to cooperate with him 100 percent and would then turn around and become openly hostile to him by filing a lawsuit against him. That's not in the reasonable expectations of the parties. Okay. Now, and I think along these lines, the trial court made an error in its opinion that we're appealing from. She says that, and this is I think on page A7, A9, in the appendix, A9 I believe it is. She says the agreement does not expressly state that the village would have the right to control its own defense as the trial court. You know what, I'm getting a little off base. I think this relates to, Your Honor, the questions and the law that applies. The right to control, excuse me, the right to select counsel does not equate to the right to control. Counsel, at the end of the day, you're simply contending that you're not obligated to pay the village or the village's attorney's fees and costs. Is that your position? Correct. That's it? Yeah. They breached because of the breach. Of the duty of good faith and fair dealing and the duty to cooperate. That removes our obligation to pay for their defense fees. Yes. All right. In this third period, and I will cut to the chase because it seems as though you have. We have to get to the bottom line. I understand. The bottom line is that's our argument, that we should not have to pay for the village's attorney's fees in this instance because they continually, from step one all the way through to the end, violated the duty to cooperate. In these circumstances, I don't see how you can more violate the duty to cooperate than what they did here. So even after Hartz filed for summary judgment, at that point, we went to the city, went to the village, and said, look, it's fine to defend the agreement, but we don't want to proceed with getting summary judgment on our own because we want to go straight to trial. We've got these quantum merit claims. Because remember, Hartz said when they filed the suit initially, well, the estimated costs aren't good enough. You have to use actual costs. And Rhodes' response was, fine, let's use actual costs. That's my $30,000 number. That's the basis for the quantum merit claims that you see. They're not really explicit, but they're contained in the record. And those claims are still pending in the trial? Correct. This is a 304A appeal, and those claims are still pending. All right. So having undercut Rhodes on the amount of the full actual recapture agreement that he was owed from the beginning, the village now undercuts him on his quantum merit arguments by proceeding, not just by responding to the summary judgment filed by Hartz, but also by seeking summary judgment on its own, which, and that's how you guys got this case initially, was the 304A appeal that stemmed out of that. The breach of the duty of good faith and fair dealing excuses the other party's performance when there's a material breach. And a material breach is based on the inherent justice of the matter. Here, again, they encouraged the rival developer to file the lawsuit. They refused to even meet with us and coordinate a defense at that point. They became adverse. They lengthened the litigation. They incurred duplicative legal fees, and now they want Rhodes to pay for everything, including the counterclaims that they filed against us. That makes no sense. That doesn't comply with reasonable expectations of the parties, and based on the inherent justice of the matter, we would argue that we don't have to. We're excused, then, from our performance of paying those legal bills. I'd be more than happy to answer any other questions you have with respect to that issue. All right. The second issue, and these ones are a little bit shorter, pertains to the streets. And what we have here, way back in 1891, there was a plot of subdivision that was made or through a plot of subdivision, excuse me, there was land that was dedicated to the public as a right of way by common law dedication. The village didn't accept those at any time anywhere near 1891. Fast forward to 1973. There's no streets that are actually built on this property. The village passes an ordinance that vacates the streets, or at least the property. I say streets. I put it in quotes because, again, there's no street built. By ordinance in 1973, they vacate that land. Now, after Rhodes brings counterclaims in this lawsuit down below about what must then happen to the property, and Rhodes owns at least a portion of the land that touches and abuts the property, the village, 115 years after the dedication is a right of way, attempts to accept the streets and vacate the 1973 ordinance. Now, under the Platt Act, 765 ILCS 205-3, which I've set forth in the briefs, a statutory plan of dedication must conform to the requirements of the Platt Act. And if the Platt conveyed land to the public for the use and purposes named therein and if the premises are intended for any street, the village will hold that land in trust for uses and purposes set forth or intended. So when you're talking about dedicated streets, when a municipality does accept them, it does so as a trustee of the public. And violations of that expressed trust gives rise to questions of Cyprus. Here, I'm getting a little ahead of myself again, acceptance. Acceptance must occur within a reasonable time. Now, what's a reasonable time? As set forth in the cases I've listed, at least on page 39 on my reply brief, you know, in the Corain case, the Supreme Court said, yeah, 40 years municipality, that's too long. There's a case cited there, Jordan, 29 years, too long. Case there, Rhodes, over 20 years, too long. Here, 1891 to 2008, I think it was, was 115 years. Clearly, if 40 years, 29 years, and 20 years is too long, 115 years is too long. That's when they finally attempted to accept this property for use as streets. Further, the ordinance where they did that specifically stated they're not accepting it for public, for use as a public street, but to convey it to Hartz as part of his development. Hartz admits that this is a very important piece of property for his development. So based on that, that, you know, the trial court filed for the village and gave them summary judgment on our claims that this property should be redistributed to the owners pursuant to what's contained in the Platt Act. Now, the trial court instead focused on the municipal code. They bought into the argument raised below by the village that the section of the municipal code applies. But that's incorrect because that statute or section, specifically 65 ILCS 5-11-91-1, applies only to vacating any street. Now, here, it's undisputed that the land was never approved. There's no street there. It's unapproved. So therefore, that statute doesn't apply. Further, if an ordinance attempts to vacate property under that section of the municipal code and that vacation is for a purely private purpose, it's not effective. That's pursuant to the case, and I don't have the case name with me, but I cite that case in my briefs. Here, what they're trying to do is get this land so they can flip it over to Hartz. Well, that should not be allowed under the municipal code. I'm not saying the municipal code applies here because I think the Platt Act applies, but even if you were to argue and buy into the trial court's argument that that section of the municipal code applies, flipping it to Hartz is a purely private purpose. You can't sell something you don't own. And finally, if there are any questions on that, I'll be more than happy to entertain them before I turn my attention to the final issue. All right, the final issue pertains solely to this outlaw. There was an argument below, there's an outlaw A also, or outlaw D3. I suddenly had a brain spasm. And you filed a motion concerning this outlaw, correct? Concerning the outlaw, yes. You've asked us to take judicial notice of some documents. Yes. And then you've asked us to supplement the record. Correct. Were these documents in existence while the case was pending in the trial court? Yes, they were. Was there anything that prevented you from presenting them to the trial court? No, not the ones that we have asked this court to take judicial notice of. There were Platts that the trial court, and you'll see in the record, that the trial court did have in the record. And before she flipped her decision on this, Judge Rochford did find that her analysis of those Platts indicated that outlaw A and outlaw D3 were separate. But you're asking us on appeal to consider documents that the trial court didn't consider in making its decision. That's true. However, they are part of the public record. And as you know, you can... But you're asking us to supplement the record. I am. That's true. And I would argue that in the interest of justice, you should. Because even though I think the record, as you currently have it, clearly indicates that there is a question of fact as to whether outlaw A and outlaw D3 are one and the same, I think that the documents, the public documents that we're asking you to take judicial notice of, clearly delineate that those two alleged outlaws are different. Let me make sure that my understanding of this. So outlaw A and outlaw D3, according to my reading, all the ordinances and everything I have before me indicate that they're the same. However, I also saw in your brief where you're saying, where they talk about outlaw A being 3,135 square feet, outlaw A and D3. Then you make mention that outlaw A is 8,015 square feet. And I am trying to find, in the record at trial, was it ever brought out that outlaw A was 8,000 feet? Or at the trial level, did that judge or the evidence then only show that it was 3,135 square feet and all the ordinances and everything pertain to 3,135 square feet? But now we're saying that they're not the same thing. Will you please elaborate on that? Yeah. And I might not have a full grasp of the facts in order to delineate them back to you, Your Honor. I think the record is clear here, and I think you've touched on it, that at different places this so-called outlaw A that they seek is described differently, square feet and location, not just square footage, square feetage, but also location. You know, north of, and I don't have the street name off the top of my head, north of this street, south of here, and if you, I mean, they're in different locations entirely. And the record, as it currently stands, I think, is enough to show that there are genuine questions of material fact to show that at the very least, we don't know. You know, we don't know whether it's 3,000 or 8,000. I think the documents that I've asked you to take judicial notice of in my motion to supplement the record clearly show that there's a difference. But I think the documents that are currently in the appellate record as it stands indicate, well, at the very least, we don't know and there's a question of fact there such that summary judgment wasn't appropriate. So what you gave us for the judicial notice, that information was never presented to the trial judge? No, I think the actual plats themselves, no. The information contained in the plats that outlot A and outlot D3 are different? Yes. Well, let me say this. You never argued that point before the trial judge. I don't think that's true. I think we did argue before the trial judge that outlot A and outlot D3 are different. So did you argue that there were 8,000 square feet, that the difference in 3,000 and 8,000, did you argue before the judge that there was a big difference there? You know, I don't know. And I would hate to misstate something, so I'm going to have to defer to the record on that one, because I was not the personal attorney that was arguing in the response. I believe so, but I don't know and I don't want to make that assertion before Your Honor. But, I mean, clearly down below we argued that outlot A and outlot D3 were different. And merely because what the trial court did here was the village passed an ordinance that said outlot D3, also known as outlot A, or maybe it was the flip, outlot A, also known as outlot D3. And the trial court relied then on the ordinance, that language of the ordinance, saying, well, they're one and the same. Well, what's the basis for that? The basis is the village now wants to flip over outlot D3 over to Hartz. So the village makes a misstatement in its ordinance, and now it comes back and says, well, because it's in an ordinance, it's true. Well, that's not right. I mean, you know, usually you see that when, you know, a municipality is trying to enforce an ordinance. But here we've got a clear mistake of fact that's contained in the ordinance that is then being relied upon by the trial court. So there was an error there. When you had the ordinance 042311, which Rose participated in, with the village, where they were going to rededicate outlot A to the village, and the village would allow Rose to build four additional homes or townhouses. In that ordinance, did they talk about the size of outlet A? I don't have that in front of me, Your Honor. I'm trying to determine whether you had knowledge, whether Rose had knowledge, or did they admit at some point that outlet A was 3,000 feet as opposed to 8,000? If that was there, it was a mistake. I can tell you, and I'm looking at some record references from my reply brief at this point, the 3,000 number, 3150 square feet, the reference to that is the record is 415 to 416. The reference to the 8,015 square feet, at least in my brief, is the 2183A, because if you'll recall, the record jumped here from page 2183 to page 2184. So there's a page in between there, and that's where the 8,000 number was located, so I would rely on that in response to Your Honor. Without having looked at that particular issue, I don't want to make any representations that are untrue here before you today. Okay. The ordinance. Sir? Yeah. In reference to 423.11 on that ordinance, I think on page 2 of the ordinance, there's a point that says, to accomplish item A above, the developer at no charge will dedicate a public right-of-way outlet area of approximately 3,150 square feet in the area, and then it goes on and on. So it does have an indication in here in 2311 of the 3,000 feet, and Rose participated in this. In fact, Rose benefited from this ordinance. We'll address that question, Counsel. Did Rose benefit from the village adopting that ordinance? You know, I looked at that issue. Bear with me a minute before I respond. Listen to your. Oh, okay, here. What we're dealing with here are two separate plots of land. All right? Bear with me for a minute. Assume that is a fact, even though I know that's a question of fact. Therefore, that ordinance that you just read from, if Rose benefited from that ordinance, it had nothing to do with the transferring of the separate Outlot D3 to the village. It's a separate piece of property. There was an Outlot A, and Rose transferred Outlot A to the village. But the trial court considered them to be one and the same. Is that correct? I'm sorry? Did the trial court consider those two to be one and the same? Initially, no. No, I take that back. Yes, but that was solely based on the language of the ordinance that said Outlot D3, also known as Outlot A. That was the basis she gave as saying, well, the two must be one and the same, because it's in an ordinance. Well, simply because it's in an ordinance doesn't necessarily mean it's true. I mean, there's questions of fact there. Okay. I see. Unless there are other questions from the panel. You know, we're dealing with a situation here with respect to the duty to cooperate, where at every single instance. Yes, Your Honor? On that duty to cooperate. I'm sorry? On the duty to cooperate, which is mentioned in waste management. It's not mentioned here. Even if they did cooperate, what would you gain if they cooperated? How would that affect your duty? To pay. To pay. Well, there's a couple of things. First off, if we weren't hostile to each other, there wouldn't be two sets of attorneys, and we wouldn't be doubling the amount of our attorneys' fees. But they had the right to select their own attorneys. Yeah, but not the right to control their own defense. I mean, until the point where they file a lawsuit against us, there's no conflict of interest there. So we should be controlling that defense. So until that point, you know. Until they had a conflict. You acknowledge there was a conflict. At that point, yeah. At that point, they had a right to select their own attorney. To sue us. But that's fine. If they're going to sue us, that's great. But suing us should be on their own tab, not ours. I mean, it's absurd to think that we're going to agree to something with the village that says, yeah, you can sue us and we'll defend it. You know, you can sue us and we'll pay for you to sue us. That's absurd. What we agreed to do, and the whole purpose of the recapture was to benefit Rhodes. So therefore, if that agreement is ever challenged, yeah, we'll defend that agreement. For counsel, you've already acknowledged that when there's a conflict, that's an exception to the duty to cooperate. Yeah, but not a conflict that's inherent. I mean, what we're dealing with here is the village, when they decided to file a lawsuit against us, they became openly hostile to us. And at that point, it should be on their own tab. I mean, what we agreed to pay for was defending the agreement. Now, we don't even know what their interests are, number one, because they forgot to even meet with us. But regardless, we're not paying for two sets of attorneys here. They didn't meet with you to provide their interests? Yeah, we don't know what their interests are. I mean, because under paragraph 9, they have the right to select counsel to defend their interests. Well, we don't know what those interests are. So how do we know they have the right to select a counsel for that? I mean, it's right there in the language. You know, we have the duty to defend them. That's contained in the first portion of that paragraph. How would them disclosing their interests affect your duty to pay? Because if we know, for example, if there is a conflict of interest, we know that we then have to give them control of the lawsuit. If we have control of the lawsuit, it wouldn't have dragged out for however long. But there was a conflict. Only started by the village. I mean, there was no inherent conflict in defending the agreement. We both shared that. You know, we both filed briefs opposing Hertz's motion for summary judgment down below. But going beyond that and expanding this litigation to include all sorts of things that didn't belong in this litigation, that goes well beyond the duty to cooperate. That goes well beyond their duty to select, you know, for us to pay for their attorney. You know, the right to select counsel does not equate to the right to control that counsel, unless there's a conflict of interest. And here, no conflict of interest existed inherently in the situation. The conflict was created by the village. You know, they fully acknowledge that they never would have, they don't owe any financial obligation here at all. That's contained in the agreement. You know, there's no way the village is ever going to have to pay anything as a result of this litigation. So we share a mutual interest in defending that. But at a certain point, I mean, and all the way through, actually, they encouraged the lawsuit to be filed, knowing that they're not going to be harmed. They encouraged it to be filed. We understand, counsel. You stand on your briefs. I stand on my briefs and my argument here this morning.  Thank you. Thank you. Good morning, Your Honors. May it please the Court. I am Jacob Carraggia for the Village of Western Springs, Applee in this matter. I will note that Applee's hearts defendants have joined our brief on two of the counts, the two that are not related to the attorney's fees of which they have taken no position. May it please the Court. This Court should uphold the trial court's decision below on the three legal issues before it today for three reasons. One, the attorney's fees award was proper because there is no implied duty to cooperate in a non-insurance or subrogation agreement situation. The only thing at issue is Rhodes' obligation to defend and indemnify the village with its own choice of counsel. Second, the village may vacate an unimproved right-of-way pursuant to Section 1191.1 of the Illinois Municipal Code, no matter how it came to be dedicated to the village or whether or not there's asphalt poured upon the street right-of-way. And three, the descriptions of Outlaw A and Outlaw D3 show that Rhodes is obligated to transfer title to the village. I want to start before I get into the substance of these three arguments by just pointing out, again for the Court, the arguments that have been waived by Rhodes on this appeal. And it's important because we've noted them many times in our brief. I just want to make sure because a lot of the discussion was going towards those waived arguments this morning already. And as your honors know, issues presented for the first time on appeal are deemed waived. And that's something that's cited as recently as 1996 in the Illinois Supreme Court and 2001 in this court. And I want to point to these waived arguments. One, Rhodes makes reference that they have already dedicated, quote, unquote, Outlaw A. That was something not before the trial court, not an issue raised on summary judgment. And they're raising it for the first time on appeal. It's waived. Number two, that the village didn't invoke Paragraph 11A of the recapture agreement. Rhodes never mentioned that before in the trial court either. Number three, that having the right to select counsel is not the same as having the right to control one's defense. Never raised before the trial court that argument. Number four, that the village may only vacate pursuant to Section 1191.1 of the Illinois Municipal Code if the original dedication was via a purchase or condemnation, an argument they made in their original brief. They seem to have stepped off a bit from that in their oral argument and their reply. Number five, that the village encouraged the filing of the lawsuit. Certainly in the trial court below, they pointed to this letter that the village engineer wrote, saying, look, Hartz is questioning some of these figures. Please provide us some documentation so they'll understand and go away. He's now arguing that that's encouragement of the filing of a lawsuit. Nothing could be further from the truth, trying to bring two parties together to reach an understanding before a lawsuit is filed. In any event, that was not an argument made to the trial court. The village should have filed a motion to dismiss their arguing in their briefs, not something made before the trial court. That Rose should have controlled the entire defense of the lawsuit, not something raised before the trial court. That property must be improved to be accepted by the public, i.e., straight streets you can drive on, what I call pouring asphalt on the street. That's page 12 of their reply, raised for the first time in this lawsuit. The difference of hereto vacated and hereto accepted on plats of question that would preclude summary judgment, again, not raised before the trial court. That the village told Hartz that it would take all necessary measures to acquire Allot D3, page 20 of their brief, that also was not argued before the trial court. And all the separate time period facts and arguments here that took up most of the argument here in terms of time by the Rhodes defendants, the only things that they raised factually before the trial court are the Rhodes, the information contained in the Rhodes affidavit and the Jeff Zeigler letter in terms of this duty to cooperate. I also want to address a few jurisdictional issues. Count three of the Rhodes' amended counterclaims, which is one of the issues before this court, that's the right-of-way issue. That never included whether or not there was acceptance of the right-of-way. You heard him talk a lot about acceptance here this morning. Acceptance was in a different count in their amended counterclaims that was dismissed on a motion to dismiss on the village's motion by Judge Berman, February 13, 2007. That order was not included in the issues on appeal. That issue of acceptance was not properly appealed, and this court cannot take jurisdiction over that issue because it was not an included order in their docketing statement. It was not an included issue properly. In fact, that was something that Judge Rochford specifically said in ruling for the village. Look, this was something that was argued in the motion to dismiss. I'm not going to touch it. The only thing I'm doing here with relation to count three, which merely stated that the property, the right-of-way, was dedicated for, quote, the public purpose, and therefore any vacation must be done via a cypre action. But it's your position it wasn't included in the notice of appeal. That's correct. All right. But answer this question for me. You've heard the argument this morning. He said the village didn't cooperate. Did you cooperate? I don't know what he means by cooperate. What I do know is, Your Honor, is that there is no duty to cooperate, and I'm glad you brought me to my first point, in that the Rhodes defendants have not pointed to any case law whatsoever outside of the insurance context that would lead to an implied duty of cooperation here. This is a contractual provision that's outside of an insurance context. It's your position that the duty to cooperate only applies in insurance contracts? The only law I've seen that talks about the duty to cooperate has been in an insurance context, as pointed to by the Rhodes defendants. And this is coming out of the waste management line of cases that Rhodes defendants have talked about. And this was not only an insurance context, it was a context where the insurance contract itself explicitly allowed for the duty to cooperate. It said the party shall cooperate. And this makes sense as a policy matter, and it's important to talk about this. And in an insurance context, the insurer is stepping in the shoes. There's a subrogation issue going on. The party itself. Counsel, without addressing the cases, did the village cooperate with the Rhodes defendants? The village did its duty pursuant to the contract. The village defended the recapture agreement and got it upheld through this court. That's the first appeal? On its own motion. Yes, Your Honor. The first appeal? Yes. So after the case was remanded back, did you cooperate with the Rhodes defendants? Any duty to cooperate with the Rhodes in general, outside of the recapture agreement, is really not an issue. The duty comes from the recapture agreement, and the village performed its duties pursuant to the recapture agreement. So when he maintains that the Rhodes defendants maintain that you didn't cooperate, they're not stating a fact? That's not accurate? That sounds to me like a legal conclusion that comes from a body of case law that's not applicable to this case. I don't know how to answer that other than saying it's not an applicable issue. I want to say that it is a little bit like going down the rabbit hole. That's from Alice in Wonderland. The Queen of Hearts says, Why sometimes before breakfast I believe six impossible things. This is an impossible thing. It's somehow looking at the village's action in successfully defending every portion of the recapture agreement, all five legal arguments of the other party of the recapture agreement, to where the court has upheld the recapture agreement in favor of Rhodes on only the village's motion, by the way. Rhodes didn't move for summary judgment, did not join us in that summary judgment, merely joined in the opposition of Hearts' summary judgment. We defended that to the hilt and were successful. And to say somehow that that did not perform our duty under the recapture agreement is a reversal of reality by pointing to a few letters. There's no legal authority that supports their position that you have a duty to cooperate. That's essentially what you're arguing. That's correct. And if we look at the text, and I want to concentrate on this, because in the reply brief there were some ellipses put in on that interest section. The whole textual argument here seems to stem from what the interest is. And the interest, as I think this Court has noted in the earlier argument, mentions Rhodes not once. And Rhodes, the Rhodes defendants put in ellipses that made it seem like the word there referred to the village in Rhodes. Whereas if you take out the ellipses and read the whole thing, their choice to represent and defend their interests referred to the village, along with its former, current, future officials, employees, servants, agents, attorneys, insurer, and their successors and interests sued thereunder. It refers to the village and all those successors, not to the village and Rhodes. The village determines its interests, and Rhodes has the duty to indemnify and defend. And I want to make another point on this issue, that this duty to cooperate, even if this Court finds that there is a duty to cooperate in waste management and in its line of cases, states specifically that if a party that is supposed to indemnify or defend starts a lawsuit or is involved in the lawsuit from the start and does not issue a reservation of rights letter and does not countersue to determine in a declaratory judgment what the coverage is, they waive their rights to say that they don't have the duty to defend and indemnify. That's specifically stated in waste management. I just want to point that out to be clear. None of that is in the record. None of that was done by Rhodes here. They're pointing to this ex post facto and saying, oh, by the way, there's a letter that shows maybe the village didn't join us all the time. The record is clear. The village did its duty under the recapture agreement. And I want to point out another count that was sued, that was dismissed by Judge Berman on February 13, 2007, was a count saying we breached our duty under the recapture agreement. We breached the recapture agreement. The judge said no, dismissed it on the motion to dismiss. Again, not an issue before this court. I want to turn to the second point now about the trial court was correct in finding that the village may vacate the disputed rights of way. Again, the acceptance issue is not before this court. That was something that was determined on the motion to dismiss, not properly appealed. But even if this court finds that it is before it, the case law is clear that improvements in the area on a plat, even if it's not in that specific right of way, indicate acceptance. And that's something we've cited in our briefs time and time again, not really talked about by the Rhodes defendants except to say, no, that's just ridiculous. This was a huge plat that was recorded in 1891. And lots of it was developed. Streets were put in. Sewers were put in. Street lights were put in. That's all on the record and uncontested. The courts have said that if that's the case, the presumption is that all the rights of way on that plat are accepted. And that's that. And even if that is not the case, there's a common law continued dedication here that I want to point to. Rhodes himself and his own engineers recorded plats in 95 and 96 that showed that those areas, those rights of way we're talking about, were rights of way in the village. That goes to our estoppel argument. It goes to our common law. Look, everybody was treating these as if they were rights of way owned by the village. And he can't now say, oh, well, I paid my engineers and we did our research and we gave those to the village and got the benefits of those. But now, oh, look, we found the 73 ordinance that doesn't appear to have had any effect for any of the parties involved. He's just to stop from making that argument. And our case law is clear on that and really unanswered by the Rhodes defendants. I want to touch for a moment on this plat act versus the municipal code. Again, an argument waived by not being made in the trial court, but in the instance this court wants to review it anyway. The plat act merely says that the public interests are what's at stake in a municipality holding rights of way. But the municipal code, the portion that we are trying to vacate these rights of way under, state that whenever the corporate authorities of any municipality, whether incorporated by special act or any general law, determine that the public interest will be subserved by vacating, there's the dovetail with the plat act. If the village determines the public interest will be served by vacating, we don't need this road anymore, we don't want to develop it, whatever the reason, that is presumed to be enough to vacate the street. There's no requirement that Rhodes defendants pointed to in any way that requires actual asphalt to be poured, actual construction of any street before a vacation can take place. That's just purely out of thin air and should not be considered by this court. I want to turn to point three now. And this is another literary reference, it's one of those mornings. Whatever the lot is called, Rhodes must dedicate it. A rose by any other name will smell as sweet. The ordinance that we're talking about here, as the court has referenced in the prior argument, is ordinance 04-2311. That was the ordinance that switched around the way the road was going to work for the Rhodes defendants and allowed for additional units of density. In return for getting this, what they called at the time, Outlot A. But they didn't just call it Outlot A, they said Outlot A, which is the 3,150 square feet in area and located north of and adjacent to 52nd Street and east of Commonwealth Avenue in the Harts Parcel. And it was depicted as a map on that ordinance. And the trial court specifically said, look, there may have been some confusion over what this lot was called, but there was never any confusion about what the lot actually was, the description, the 3,150 square feet that was located on this corner. And there's been no testimony whatsoever that, excuse me, no evidence or argument put in that this contractual argument that the trial court found for us on is incorrect in any way, but they're trying to throw this, oh, well, look, there's an outlot called D3 and there's an outlot called A, so there's a factual dispute. No, there's not a factual dispute. This outlot, whatever it's called, you can call it Outlot X, you can call it the outlot. The description was there, it was clear that the Rhodes defendants had to give that title in return for what they're getting on the south end of the Commonwealth properties. So unless this court has any further questions, we'll stand on our arguments in the brief and ask that this court affirm the trial court's decision on all three matters. Thank you. Just a few points of rebuttals here, Your Honor. Point number one, with respect to the duty to cooperate, waste management, which did arise in an insurance context, says, even were the expressed words duty to cooperate omitted from the insurance contract, such a duty could reasonably be inferred based merely on principles of fairness and good faith. That's, well, I quote it, it's 144 ill second at 202. I quote that on page 30 of my opening brief. Second off, on page one of my reply, and I think I list them also in the opening brief, but on page one of the reply, I list the Martindale case, the Piolet case, the Bank One versus Rossetti case, the Schwinder case, the Kipnis case, the Spurkoff case, and the Kleback case, as well as the Williston on Contracts Treatise. Each one of those did not arise in the insurance context. Not one of those is an insurance case. We also have this concern about using insurance cases at all, and let me talk about that briefly, because in an insurance context, I think the duty to cooperate is usually explicit. You must cooperate with the insurer. Here we're dealing with the implicit duty to cooperate. You know, so how are the insurance cases applicable? Well, they're applicable when you're trying to apply what their duty is. For example, when my wife looks at me and says, Jeff, do the dishes, I know what I'm supposed to do. I'm supposed to go over to the sink, do the dishes. When my wife gives me a look, she looks over at the dishes in the sink, and then she looks at me and she doesn't say a word, I know what I'm supposed to do next. Even though it's implicit, I know I'm supposed to go to the sink and do the dishes. So in this instance, whether you're explicit or implicit on a duty to cooperate, what you're supposed to do next, you can look at the insurance cases in that context. Now, I find that interesting because the minute he says, well, and this is Judge Rochford bought into it too, you can't apply insurance cases here. Well, but then he turns right around and he says, well, but then you're, you know, if there is a duty to cooperate, I mean, you know, if you've got all the duty to defend, you have to issue a declaratory, you know, a letter, or you have to institute a declaratory judgment. Well, that only applies in insurance cases. So in one instance he's saying insurance cases don't apply, and the next instance, you know, out of the next breath, he says they do apply. Well, I mean, you know, the ability and obligation to file a declaratory judgment doesn't fall on a non-insurer. I think that's clear. At least I've never seen it applied to a non-insurer. There was a couple other arguments, and there was a lot of them, so I might not touch on them all. You know, anytime you hear a waiver, you know, that's usually an indication to me, the argument of waiver, it's usually an indication to me that they don't have a fallback argument. You know, well, he waived it. And for every time I've seen an appellate court judge say, well, it's waived, you know, I've also seen appellate court opinions that say, well, we can affirm or make our decision basis present, excuse me, we can make our decision on any basis present in the record. I think based upon the record that you have, I think it's clear here that the summary judgment was entered improperly. A lot of the things that he mentioned were responding to his arguments that he raised in his response brief up here on appeal. And I'm not going to go through them each individually because I had a hard time writing them all down, but I will direct your attention to something else here. With respect to the streets, he mentions that the streets were improved. You know, he mentioned the improvements. Well, on page 28 of his brief, they admit that the disputed property is unimproved. What he's talking about are improvements to the area. And as the case law cites that we set forth in our brief, improvements to the area are not the same thing as putting in the street. I mean, here they were given this disputed property for the sole and explicit purpose of putting it in a public way. They didn't do that. And they never did. So, you know, for them to say that they accepted it now, that's just not correct. We're not dealing with a continual dedication here. The plats that were submitted by the Rhodes defendants, first off, those were done, again, what, 100 years after the initial dedication, first off. And second off, as we point out on page 13 of our reply, there's some dispute there. They're claiming that they see on that plat that we say heretofore accepted. Well, you can look for yourself, but I didn't see those words anywhere on those particular plats. And you can look at them yourself, 1936 and 1941 in the record. Yeah, I didn't see those words. I saw heretofore vacated. That's a big difference. Because, remember, in 1973, they vacated the dedication. So we're not dealing with a continual dedication situation. With respect to the duty to cooperate, and I guess this will be my final point. Oh, I wanted to bring your attention to one other thing. The resolution, 06-1915, that talks about Outlaw D3, also known as Outlaw A, that followed the building permits that the village now claims were issued as a result of that resolution by six months. So, clearly, there was no estoppel that comes into play. With respect to the duty to cooperate, he says the village defended the agreement. Well, as we saw in paragraph 9 of the recapture agreement, the very first thing it says is that Rhodes owes the duty to defend. In light of the arguments here today, I'll stand on my brace in the arguments here before you, if there are no other questions, that is. I'd ask that the court reverse the decision on the duty to cooperate and the statute pertaining to the streets and vacate and remand for purposes of the Outlaw D3 issue. Thank you very much. Let me thank both sides and tell both sides that your brief and your oral arguments were excellent. We'll take this matter under advisement. This case is court adjourned.